# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | **NO. 14-209-1, 2** |
| | : | |
| **MARQUIS WILSON, *et al.*** | : | |

**KEARNEY, J.** December 11, 2017

## MEMORANDUM

Lacking income or support while living in a car, two men persuaded a new girlfriend working at a bank and a third friend to help them rob the girlfriend's employer of $150,000 in two robberies. After law enforcement arrested the four conspirators, the girlfriend and third friend plead guilty to avoid trial and testify in great detail as to the planned bank robberies in the trial of the two other conspirators. The jury unanimously convicts both men of bank robbery using firearms. The two men now ask us to either acquit them as a matter of law or grant them a new trial by challenging the sufficiency of the evidence adduced by the prosecutors, the trial judge's instructions on the law and lawyers' possibly prejudicial statements to the jury. But winning these motions is a difficult task. When, as here, the jury finds guilt beyond a reasonable doubt after evaluating credibility of two co-conspirators who plead guilty, law enforcement agents, videotape and several bank employees, the convicted conspirators cannot overturn the jury verdict by challenging the evidence. Studying the trial transcript before Judge Davis confirms the prosecutors adduced substantial evidence on each element of the charge, Judge Davis gave the proper instruction on the law and the lawyers' statements did not prejudice either of the two men. As the two men cannot show a basis for upsetting the jury's unanimous verdict, we deny their post-trial motions in the accompanying Order.

## I.    Background

On October 2, 2013, Wells Fargo Bank employee C.K. completed her college admission test hoping to study business and accounting in college. While leaving the exam location, Malcolm Moore stopped C.K. on the street with the purpose of introducing her to Marquis Wilson. Wilson and C.K. began a romantic relationship shortly after this meeting. As described at trial, the first days of their courtship involved discussing how to rob the bank employing C.K.

Wilson learned C.K. worked at a Wells Fargo branch in Bala Cynwyd, Pennsylvania. Wilson immediately took an interest to C.K.'s job and asked her questions about the bank's day-to-day operations, the bank's security, and the amount of money stored in the bank's vault. C.K. offered Wilson answers to his questions without any notable resistance. At one point, Wilson bluntly asked C.K. if he could rob the Bala Cynwyd bank. C.K. initially thought Wilson joked about robbing the bank. In time C.K. believed Wilson wanted to actually rob the bank. Wilson began recruiting others to join his plan, including C.K. During this time, Wilson and Moore both faced significant financial troubles and were currently living in a car. Wilson recruited Moore, who he commonly referred to as and who the surrounding community treated as his brother. Wilson and Moore attempted to recruit L.H.    Messrs. Wilson and Moore met with L.H. on several occasions to discuss the robbery but L.H. did not join the conspiracy. Rather, L.H. eventually decided to tip law enforcement to Wilson and Moore.

To replace L.H., Wilson and Moore recruited a friend, M.F. Wilson, Moore, M.F., and C.K. met on numerous occasions in short weeks after C.K. met Wilson to plan and prepare for the robbery. Using C.K.'s information provided about the bank by C.K., the conspirators created a detailed plan to effectuate the robbery. Moore would first enter holding a gun. Wilson would follow holding a duffle bag to store the money. M.F. would enter last and lock the front entrance

2

to the bank. M.F. would also keep track of how long the conspirators remained in bank in order to keep the robbery moving quickly. The conspirators also planned their attire of all black clothing, masks, and gloves. The robbery would occur while C.K. worked at the bank. C.K. would signal to begin the robbery by sending a blank text message to Wilson.

On November 4, 2013, the conspirators committed the armed bank robbery as planned. After committing the robbery, Wilson, Moore, and M.F. decided it would be best to "lay low" at Wilson's relative's house in Georgia. C.K. remained in Philadelphia. While driving through North Carolina on the way to Georgia, a police officer stopped the three men for a driving violation. Based upon his observations and statements made by the conspirators, the officer decided to search the vehicle and found a bag filled with nearly $80,000 wrapped in Wells Fargo straps in the trunk of the vehicle. The North Carolina police decided to seize the money suspecting the three men were travelling to complete a drug trade.

Frustrated in losing their robbery proceeds, the conspirators returned to Philadelphia to rob another bank. The conspirators immediately began casing Wells Fargo banks in the Philadelphia suburban area to find their next target. The conspirators found a Wells Fargo branch located in Phoenixville, Pennsylvania very similar in format to the Bala Cynwyd branch. The conspirators planned to rob the bank in the same manner they robbed the first.

On November 11, 2013, the conspirators drove to the Phoenixville branch with the purpose of committing the robbery, only to discover banks are closed on Veterans Day. The next morning, the four conspirators returned to the Phoenixville branch. C.K. provided the signal to Wilson, Moore, and M.F. to enter the bank. Upon the signal, Wilson, Moore, and M.F. robbed the Phoenixville branch in the same fashion as the Bala Cynwyd branch. The conspirators stole over $70,000. After the second robbery, the conspirators went on a shopping spree in New

3

Jersey, and Wilson purchased a car and paid a $300 fine to the City of Philadelphia for an unknown violation. Shortly after, Messrs. Wilson and Moore learned law enforcement were searching for them. Wilson, Moore, and C.K. travelled to Georgia to wait out the investigation.

Upon learning of the first robbery in Bala Cynwyd, L.H. decided to tip the police as to Wilson and Moore's potential involvement in the robbery. L.H. feared he would be implicated in the robbery because he met with Wilson and Moore several times immediately before the robbery. Using the information provided by L.H. and through their own investigations, law enforcement arrested Wilson, Moore, and C.K. in Georgia.

On April 24, 2014, our grand jury returned an indictment against Wilson, Moore, M.F., and C.K. for conspiracy to commit armed robbery of two Wells Fargo banks, committing the armed bank robberies, and using or carrying a firearm during the robberies. M.F. and C.K. plead guilty to the offenses and agreed to provide truthful testimony at trial. The Honorable Legrome D. Davis presided over a five day trial against Wilson and Moore. The jury unanimously found Wilson and Moore guilty of conspiracy to commit armed bank robbery, armed bank robbery, and using or carrying a firearm during a crime of violence.

## II. Analysis

Messrs. Wilson and Moore move for judgment of acquittal under Fed. R. Crim. P. 29 and for a new trial under Fed. R. Crim. P. 33. Under Rule 29, they argue the United States adduced insufficient evidence to sustain a conviction for conspiracy, armed bank robbery, and use of a firearm during a crime of violence. Under Rule 33, they argue their trial counsels' decision to stipulate to Wells Fargo's FDIC insured status constituted ineffective assistance of counsel, the United States improperly vouched for its witnesses and their credibility, and Judge Davis failed to instruct the jury on an element of the firearm offense. Moore also argues Wilson's trial

4

counsel's opening statement prejudiced him. After studying the trial transcript before Judge Davis, extensive briefing and thoughtful oral argument, we deny Messrs. Wilson's and Moore's motions.

## A. We deny Messrs. Wilson and Moore's motions for judgment of acquittal.

Rule 29 provides "[a]fter the government closes its evidence ..., the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."[1] In considering a Rule 29 motion, we "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence."[2] We are required to "draw all reasonable inferences in favor of the jury's verdict," and a finding of insufficiency should "be confined to cases where the prosecution's failure is clear."[3] "We do not reweigh evidence or assess witness credibility," and "we must sustain the verdict 'if a rational trier of fact could have found [the] defendant guilty beyond a reasonable doubt, and the verdict is supported by substantial evidence.'"[4]

### 1. A rational trier of fact could have found beyond a reasonable doubt Messrs. Wilson and Moore guilty of conspiracy to commit armed robbery.

The United States charged Messrs. Wilson and Moore with conspiracy to commit armed robbery under 18 U.S.C. § 371. The elements of conspiracy under Section 371 include "(1) an agreement between two or more persons to commit a federal crime, (2) knowledge of the purpose of the conspiracy and a deliberate decision to join in that purpose, and (3) commission of an 'overt act' by one of the participants in furtherance of the conspiracy."[5]

Messrs. Wilson and Moore argue the United States failed to adduce sufficient evidence for the jury to conclude beyond a reasonable doubt they conspired to commit armed bank

5

robbery. Moore cites to L.H.'s trial testimony, the tipster who provided information to local law enforcement during the course of their investigation of the robberies. L.H. discussed various meetings with Wilson and Moore before the robberies. During these discussions, L.H. explained Wilson attempted to recruit him to participate in the robbery. L.H. testified Moore did not speak during these meetings but remained present in the immediate area where the meetings took place. Moore argues his "mere presence" is insufficient to sustain the jury's verdict. United States argues it presented sufficient evidence for a rational juror to conclude beyond a reasonable doubt both Wilson and Moore conspired to commit armed bank robbery.

Two co-conspirators, C.K. and M.F., testified Wilson and Moore conspired to commit armed robbery. C.K. provided detailed testimony regarding her conversations with Wilson and Moore in planning and preparing for the armed bank robbery. C.K. testified Wilson proposed the idea of robbing her employer.[6] C.K. also testified she met with Wilson and Moore in a car in front of her house and discussed the details of the robbery.[7] Similar to discussions throughout the course of this conspiracy, the evidence shows Wilson led the conversation. But Moore participated beyond his mere presence. Moore offered his input into the plan to commit the robbery and asked C.K. follow up questions about the Bala Cynwyd bank and its layout.[8]

The co-conspirators also discussed the use of a gun, which Moore possessed at the time of the conversation and C.K. observed.[9] All three co-conspirators planned a role in committing the robbery.[10] A few days before the first robbery, C.K. met with Wilson and Moore once more and discussed the addition of a third man into the conspiracy.[11] The weekend before the first robbery, C.K. met again with Wilson and Moore.[12] C.K. suggested Wilson and Moore hand each teller a note demanding money, rather than use a gun.[13] Wilson and Moore rejected the idea concluding the logistics would be too complicated and believed they would steal more money

6

using an aggressive approach with the gun.[14]  Wilson and Moore referred to the gun as a ".40."[15]

The co-conspirators also discussed each person's role during the robbery.[16]  Moore would enter the bank with the gun, Wilson would enter with the bag to store the stolen money, and the third man would serve as a lookout.[17]

M.F., the second cooperating co-conspirator and the third man joined in the conspiracy, testified against Wilson and Moore.  M.F. testified Wilson and Moore approached him and recruited him to participate in the planned robbery.[18]  A few days later, Wilson and Moore met with M.F. inside Wilson's car.[19]  Wilson explained to M.F. they had the gun to use during the robbery.[20]  Moore pulled the gun from the center console of the car, showed it to M.F. and handed it to Wilson.[21]  Wilson received the gun and described the gun as "fully loaded."[22]  The parties then discussed the role of each conspirator during the robbery.[23]  Wilson would hold the bag to store the stolen money, Moore would hold the gun, and M.F. would lock the bank's front entrance and serve as the lookout.[24]  M.F. testified conspirators planned to pull into the back of the bank parking lot and sneak around the side of the bank underneath the drive through window towards the entrance.[25]  The conspirators planned for Moore to enter first, Wilson second, and M.F. third.[26]  The conspirators also agreed to wear all black clothing, masks, and gloves during the robbery.[27]

Like the conversations referenced above, Wilson led the conversations with Moore and M.F.  But also similar to the conversations referenced above, Moore participated in the conversations, albeit not in a leadership role.[28]  Although the evidence reflects Moore did not hold a prominent speaking role in the conspiracy, C.K.'s and M.F.'s testimony confirms Moore did not merely stand present in the area where the parties formed and furthered the conspiracy.  Moore joined and participated in discussions planning the armed bank robbery.  Wilson and

7

Moore, along with C.K. and M.F., created a step-by-step plan to rob the bank. The conspirators went as far as planning each individual's role in the robbery, the order of entry into the bank, and the clothes each conspirator would wear on the day of the robbery.

Messrs. Wilson and Moore try to discount C.K.'s and M.F.'s testimony claiming the cooperating co-conspirator testimony is "corrupt and polluted" and "largely uncorroborated." Even assuming *arguendo* M.F. and C.K. offered largely uncorroborated testimony, our court of appeals instructs uncorroborated cooperating accomplice testimony is sufficient to sustain a conviction, particularly where the accomplice is subject to cross examination by the defense.[29] Wilson's and Moore's trial counsels had the opportunity to cross examine M.F. and C.K., and did so at trial. Trial counsel cross examined each cooperating witness on the subjects of their plea agreements, their inconsistent statements to law enforcement, and whether each witness handled the gun used during the robberies.

In addition to the co-conspirator testimony, law enforcement tipster L.H. offered testimony regarding his meetings with Wilson and Moore before the first robbery. L.H. last met with Wilson and Moore on the same street as the Bala Cynwyd bank.[30] During the meeting and in an attempt to recruit L.H. into the conspiracy, Wilson pointed to the bank further down the street and told L.H. he had an inside connection to the bank.[31] L.H. explained he did not want to participate in the robbery and changed the subject.[32] Trial counsel cross-examined L.H. regarding his inconsistent statements to law enforcement and his receipt of a monetary award from law enforcement after providing a written statement.

We cannot usurp the jury's role in assessing witness credibility or weighing evidence, and it is within the jury's province to accept the cooperating witnesses' and tipster's testimony. Hearing this testimony, a rational juror could find Wilson and Moore agreed to commit armed

bank robbery with knowledge of the conspiracy's purpose. The evidence adduced shows Wilson originated the idea to rob the banks and led the planning process of the robberies. Although Moore did not act in a leadership role, the evidence shows he actively participated in the planning of the robberies and recruitment of conspirators beyond his "mere presence." Moore's willing participation in the recruitment and planning meetings evidence his agreement to commit the robberies. The United States adduced sufficient evidence Wilson and Moore committed the armed robberies in furtherance of the conspiracy. A rational juror could have accepted C.K.'s, M.F.'s, and L.H.'s testimony to find Wilson and Moore guilty of conspiracy to commit armed bank robbery.

## 2. A rational trier of fact could have found beyond a reasonable doubt Messrs. Wilson and Moore guilty of armed bank robbery.

United States charged Wilson and Moore with armed robbery under 18 U.S.C. § 2113. Section 2113(a) provides "[w]hoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another . . . any property or money . . . belonging to, or in the care, custody, control, management, or possession, of any bank . . . [s]hall be fined . . . or imprisoned not more than twenty years, or both."[33] Section 2113(d) further provides any person who in committing an act previously described "assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device, shall be fined . . . or imprisoned not more than twenty five years."[34] The "dangerous weapon" need not be shown to be real or operable in order to sustain a conviction for armed bank robbery if it "would reasonably have instilled fear in an average citizen."[35]

Messrs. Wilson and Moore argue United States failed to adduce sufficient evidence to prove beyond a reasonable doubt they committed armed bank robbery. Wilson and Moore argue the testimony of one bank employee estimating the robbers' height coupled with the height of the

9

robbers in the bank's surveillance footage make it physically impossible for the conspirators to be the robbers. Wilson and Moore also cite to evidence regarding their access to a fake or prop gun, and law enforcement never recovered the actual gun used during the robberies.

The arguments fail to address the entirety of the evidence submitted to the jury, and the United States adduced ample evidence for a rational juror to find Messrs. Wilson and Moore guilty of armed bank robbery. Co-conspirator testimony, even if uncorroborated, may be sufficient to sustain a conviction under Section 2113, particularly where the co-conspirator is subject to cross-examination.[36] Our court of appeals recently rejected applying a heightened standard to uncorroborated co-conspirator testimony to sustain a verdict at trial.[37] The jury heard testimony from co-conspirators C.K. and M.F. sufficient to sustain the convictions for armed bank robbery. But the jury also heard testimony from Wells Fargo employees, local law enforcement, and FBI agents supporting the convictions and corroborating the co-conspirator testimony.

Five Wells Fargo employees present during the robberies testified. A Bala Cynwyd bank teller testified she witnessed all three robbers enter the bank and witnessed one robber jump on the teller counter while holding a gun and demand everyone get down on the ground.[38] The teller testified the robber stood on the counter dressed in all black clothing and a black mask.[39] The teller testified another robber jumped over the counter with a duffle bag and demanded the tellers empty the money drawers.[40] The robber holding the bag threatened the teller by stating, "You don't want to die for this bank's money, do you?"[41] The tellers complied and put the money inside the duffle bag.[42] The robber wielding the gun asked where the bank stored the remainder of its money.[43] The teller used her keys to unlock another drawer and the robber holding the duffle bag stole the money.[44]

10

A Bala Cynwyd branch service manager heard yelling from the teller area and witnessed a robber jump on top of the counter pointing a gun at the tellers.[45] The service manager described the robber as wearing all black clothing.[46] A Bala Cynwyd financial advisor, while working in his office, heard someone yell "Everybody down. This is a robbery."[47] The financial advisor witnessed a robber jump over the teller counter and another robber walk towards his office.[48] The financial advisor heard the robbers demand the tellers for money and heard tellers crying.[49] The robbers stole $81,059 from the Bala Cynwyd branch.[50]

A Phoenixville teller and branch manager testified to the events of the second robbery. The teller witnessed three robbers dressed in all black clothing, masks, and gloves enter the bank.[51] Two robbers jumped behind the counter, one holding a gun and another holding a duffle bag.[52] One robber pointed the gun at her, almost at her face.[53] The third robber locked the front entrance of the door.[54] The robber holding the bag stole money from the tellers' drawers and grabbed a teller and demanded the teller assist in putting the money into the bag.[55] The Phoenixville branch manager also witnessed the three robbers enter the bank.[56] The robbers stole $70,470 from the Phoenixville branch.[57] All bank employee witnesses who observed any of the robbers' skin or heard their voices described the robbers as African-American males. The bank employees also testified describing the conspirators' gun used during the robbery.

Co-conspirators M.F. and C.K. provided extensive testimony regarding planning the first robbery, executing the first robbery, events resulting in seizure of the stolen money, planning of the second robbery, executing the second robbery, and the conspirators' ultimate arrest. C.K. worked as a teller at the Bala Cynwyd branch the morning of the Bala Cynwyd robbery and witnessed the robbery. At trial, C.K. identified Moore as the conspirator who entered the bank with the gun and Wilson as the conspirator who entered with the duffle bag.[58] C.K. further

testified Moore possessed the gun right before the Phoenixville robbery took place.[59] C.K. did not witness the second robbery because she served only as the signal person, signaling when her co-conspirators should enter the Phoenixville bank.[60] C.K. testified how the conspirators divided the proceeds of the second robbery and the purchases Wilson made using the stolen money.[61] The conspirators divided the money into four equal shares, C.K. and Wilson combined their shares together.[62] C.K. testified Wilson used the stolen money to purchase a car, laptop, cameras, and to pay a fine to the City of Philadelphia for an unknown violation.[63]

M.F. witnessed both robberies as he participated in planning and executing of both the Bala Cynwyd and Phoenixville robberies.[64] During M.F.'s testimony, United States showed video surveillance footage of the Bala Cynwyd robbery.[65] While viewing the footage, M.F. identified Moore as the first person to enter the bank, Wilson as the second person to enter with the duffle bag, and himself as the third person to enter the bank and lock the front entrance.[66] During M.F.'s testimony, United States showed video surveillance footage of the Phoenixville robbery.[67] While viewing the footage, M.F. identified Moore as the robber with the gun, Wilson as the robber with the bag, and himself as the third robber entering the bank.[68] Both C.K. and M.F. testified describing the gun the conspirators' used during the robberies.

Seven local law enforcement officers and FBI agents testified regarding the investigation into the robberies and their findings. Detective Walter Kerr testified upon reviewing the footage of the Bala Cynwyd robbery, the duffle bag had a distinctive white stain, and a Polo brand logo.[69] Detective Kerr also reviewed the dash cam footage of Wilson's, Moore's and M.F.'s traffic stop by Officer Joshua Freeman shortly after the Bala Cynwyd robbery.[70] The video showed Officer Freeman searching a duffle bag found in the trunk of the car containing $77,941.[71]   Officer Freeman decided to seize the money for further

12

investigation.[72] Detective Kerr testified the bag in the conspirators' car had the same distinctive features as the bag used during the Bala Cynwyd robbery.[73] Officer Freeman confirmed the duffle bag had a white stain and had a "Polo Sport" brand label.[74] Detective Kerr further testified Wells Fargo straps bundled the money together.[75] M.F. confirmed the money seized as the money stolen from the Bala Cynwyd bank, and stored in the same bag used during the Bala Cynwyd robbery.[76] Detective Kerr also testified the gun used during the robberies appeared to be a .40 caliber Glock, the same gun Detective Kerr carried.[77]

FBI Agent James Fitzgerald testified to paper records of vehicle rentals and hotel bills which corroborated the co-conspirator's accounts of the vehicles used during the robberies and the conspirators' movement after each robbery.[78] FBI Agent Adam Sucheski conducted an analysis of the conspirators' cell phone records and created a summary of the number of calls and text messages between the conspirators during the time of the formation and execution of the conspiracy. The cell phone records showed eleven text messages between C.K. and Wilson the morning of the Bala Cynwyd robbery.[79] United States qualified FBI Agent William Shute as an expert in cellular telephone analysis.[80]    Agent Shute provided an analysis tracking the conspirators' locations at relevant times further corroborating the co-conspirator testimony.

C.K., M.F., L.H., Wells Fargo employees, and law enforcement officers adduced ample testimony regarding the gun used during the robberies to satisfy the meaning of "dangerous weapon and device" under Section 2113. The testimony provided a sufficient basis to for a rational juror to conclude the conspirators used a real gun. Even assuming *arguendo* the evidence showed the conspirators used a prop gun, the use of the prop gun would still satisfy the meaning of "dangerous weapon or device" because it reasonably would have instilled fear in an average person in the context of the bank robberies taking place.[81]    The bank employees

13

complied with the conspirators' demands fearing for their safety. Bank employees testified they heard other employees crying out of fear, and C.K. testified she even feared for her safety when Moore pointed the gun at her despite knowing Moore and when the robbery would take place.[82]

The United States presented sufficient evidence to show the Bala Cynwyd and Phoenixville branches of Wells Fargo satisfy the meaning of "bank" as used in Section 2113. A rational juror could have found beyond a reasonable doubt Messrs. Wilson and Moore guilty of armed bank robbery.

### 3. The trial stipulation to the FDIC insured status of the banks is sufficient for a rational trier of fact to conclude beyond a reasonable doubt the banks at issue were FDIC insured.

Messrs. Wilson and Moore argue the United States failed to establish the banks at issue were FDIC insured and therefore failed to establish a necessary element of the bank robbery offenses and a jurisdictional prerequisite. United States argues the parties' stipulation at trial to the FDIC insured status of the two banks and the introduction of Well Fargo Bank N.A.'s FDIC insurance certificate satisfied the element and jurisdictional prerequisite. Wilson and Moore argue the FDIC certificate is insufficient because it is dated three years before the robberies took place and is not directed to the two banks at issue. Wilson and Moore also argue the stipulation is insufficient because trial counsel agreed to the stipulation without asking whether they understood the stipulation, whether they consent to the stipulation, and whether they understood the stipulation satisfies a necessary element of the bank robbery offenses and a jurisdictional prerequisite.

Section 2113 defines the term "bank" to include "any institution the deposits of which are insured by the Federal Deposit Insurance Corporation."[83] Showing the Wells Fargo banks at

14

issue fall within the meaning of "bank" under these statutes is both an element of the offense and a jurisdictional prerequisite.[84]

Under Section 2113, a stipulation may be sufficient to show the banks at issue are FDIC insured.[85] In *United States v, King*,[86] the defendant filed a motion for judgment of acquittal or in the alternative a new trial challenging his conviction for armed bank robbery under 18 U.S.C. § 2113(d).[87] To show the FDIC insured status of the bank at trial, the prosecution read on the record a stipulation entered with the defense.[88] The parties stipulated if called as witnesses, a representative of the bank and a representative of the FDIC would have testified the bank held FDIC insured status at the time of the robbery.[89] In his post-trial motion, the defendant argued no rational trier of fact could have found him guilty of the offense beyond a reasonable doubt.[90] Upon review of the evidence presented at trial in light most favorable to the prosecution, the court found a reasonable juror could have accepted the evidence against the defendant to support the guilty verdict.[91] Specifically, the court concluded the stipulation by the parties sufficient to satisfy the FDIC insured element of the robbery offense.[92]

At trial, Wilson's and Moore's trial counsel, and United States stipulated to the FDIC insured status of the Wells Fargo banks at the time of the robberies:

[UNITED STATES' COUNSEL]: Your Honor, we have a stipulation with regard to the next witness. If I could just –

THE COURT: Sure.

[UNITED STATES' COUNSEL]: -- put that on the record.

THE COURT: I need you to remember ladies and gentleman, a stipulation is an agreement by and between counsel and the parties that a particular fact is true. And it is

15

submitted to you, and you decide, ultimately, in your providence as fact finders, whether you accept it or don't accept it. But it's not contested by the parties. Go ahead sir.

. . .

[UNITED STATES' COUNSEL]: And also, Ms. Bailey (ph) would testify that at the time of the robbery on November 4, 2013 Wells Fargo Bank was, in fact, insured by the FDIC. United States Exhibit 1, the FDIC certificate, is admissible to support that testimony.

THE COURT: So you'd agree to the admissibility of G-1 and the fact the bank was FDIC-insured on November 4th; is that correct, folks?

[MOORE'S COUNSEL]: Yes.

[WILSON'S COUNSEL]: Yes, Your Honor.

THE COURT: All right.

. . .

[UNITED STATES' COUNSEL]: And that the FDIC certificate, Government Exhibit 1, covers the entire Wells Fargo Bank, all the bank branches, not just the one in Bala Cynwyd, and it was also effective on November 12, 2013.

THE COURT: So stipulated?

[WILSON'S COUNSEL]: So stipulated.

[MOORE'S COUNSEL]: So Stipulated.

THE COURT: Very well.

[UNITED STATES' COUNSEL]: That's it.[93]

The Ms. Bailey referred to in the stipulation is Adrianne Bailey, a Wells Fargo employee in the loss prevention unit.[94] The United States had Ms. Bailey present and prepared to testify at

trial regarding the FDIC insured status of the banks. Immediately before calling Ms. Bailey, trial counsel agreed to and read on the record the stipulation to the banks insured status.

Wilson and Moore challenge the sufficiency of the stipulation because (1) the FDIC certificate introduced at trial is dated three years before the robberies occurred; (2) the FDIC certificate is not issued to the two banks at issue, rather it is issued to Wells Fargo Bank, N.A.; (3) United States did not offer any testimony regarding the FDIC insured status of the banks; (4) United States did not exchange any materials in discovery regarding the banks' FDIC insured status; and (5) the record does not reflect their intelligent and voluntary consent to the stipulation.

Messrs. Wilson and Moore's first three challenges are easily resolved upon review of the stipulation offered to the jury. In the stipulation, the parties explicitly agreed Ms. Bailey would testify, and the FDIC certificate supported the fact, the Wells Fargo banks at issue held FDIC insured status at the time of the robberies. The FDIC insured certificate is issued to Wells Fargo & Co.'s operating subsidiary Wells Fargo Bank, N.A. located in Sioux Falls, South Dakota. But the parties stipulated to the testimony the certificate applied to *all* Wells Fargo bank branches and applied on the dates of both robberies.

Messrs. Wilson and Moore's argument United States failed to establish FDIC insured status because it did not offer testimony at trial similarly fails. United States did not offer any testimony on FDIC insured status because the parties entered into the stipulation. The stipulation explicitly contemplated the testimony United States planned to offer. Immediately before United States called Ms. Bailey to testify, the parties agreed to and offered the stipulation in place of Ms. Bailey's testimony. The fact United States did not offer Ms. Bailey's duplicative testimony on top of the stipulation is of no consequence. Based on the FDIC insured certificate introduced

17

coupled with the stipulation of Ms. Bailey's testimony, a rational trier of fact could have found the two banks at issue were FDIC insured at the time of the robberies.[95]

To the extent Wilson and Moore argue their trial counsels entered into the stipulation without obtaining their knowing and voluntary consent and their trial counsel agreed to stipulate without receiving certain discovery materials, those issues are best reserved for a 28 U.S.C. § 2255 motion and are not ripe for our review.[96]

### 4. A rational trier of fact could have found beyond a reasonable doubt Messrs. Wilson and Moore are guilty of using or carrying a firearm during the bank robberies.[97]

The United States charged Wilson and Moore with using or carrying a firearm during a crime of violence under 18 U.S.C. §§ 2 and 924(c). Section 924(c) provides an additional punishment against any person who, during and in relation to a crime of violence, uses or carries a firearm or in furtherance of such crime possesses a firearm.[98] Section 2 provides any person who "commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission is punishable as a principal."[99] "Firearm," as used in Section 924(c), includes "any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive."[100]

Messrs. Wilson and Moore argue the United States failed to adduce sufficient evidence for a rational juror to conclude beyond a reasonable doubt they used a real firearm during the armed robberies. Wilson and Moore argue the evidence showed the conspirators only had access to a prop or BB gun, not a real firearm. Wilson and Moore also argue the evidence against them is insufficient because all witnesses who testified regarding the firearm did not handle the gun and United States never recovered the actual gun used in the robberies.

18

Lay testimony from victims of a robbery explaining a robber used a gun is sufficient to support a conviction for using a firearm in commission of a violent crime.[101] The actual gun used during the offense need not be produced and the testimony describing the gun is sufficient for a rational juror to conclude beyond a reasonable doubt a defendant used a firearm.[102] In the context of an armed bank robbery, testimony from bank employees describing the gun they observed during the commission of the robbery and their belief regarding the gun's authenticity is sufficient to sustain a conviction under Section 924(c).[103] Testimony describing the gun is sufficient even if the witness does not testify to the gun's weight or length and did not actually handle the gun at issue.[104] "The act of threatening others with a gun is tantamount to saying that the gun is loaded and that the gun wielder will shoot unless his commands are disobeyed."[105]

Over the course of the five day trial, the jurors heard testimony from employees of the two banks robbed, local law enforcement officers, FBI agents, the government informant, and the cooperating co-conspirators regarding the gun used during the robberies. Five Wells Fargo employees – three present during the Bala Cynwyd robbery and two present during the Phoenixville robbery – each testified one of the conspirators held a gun during the robbery. Several were able to identify the gun as semi-automatic. A Bala Cynwyd branch bank teller testified she observed the gun during the course of the robbery and described it as black and semi-automatic.[106] The bank teller also testified another conspirator demanded keys from her to access more money and stated, "You don't want to die for this bank's money, do you?"[107] The branch service manager observed the gun while a conspirator stood on top of the teller counter pointing the gun at the tellers.[108] A financial advisor at the Bala Cynwyd branch also observed the conspirator holding a semi-automatic pistol.[109] The financial advisor explained his experience with firearms dated back to his childhood working in his father's business as a

19

firearms dealer.[110] Based on his observations and his experience with firearms, the financial advisor believed the gun held by the conspirator to be real, not a BB gun.[111] On cross examination, the defense highlighted the fact the financial advisor did not handle the weapon at issue.[112]

The bank teller and branch manager present during the Phoenixville robbery each observed a conspirator wielding a gun during the robbery. The teller not only observed the gun but faced the gun's barrel when the conspirator pointed the gun at her.[113] The teller described the gun as a black semi-automatic pistol with a gold color appearing on the front of the gun.[114] The branch manager described the gun as black, but could not identify the gun type.[115]

Apart from the victim's testimony, both cooperating co-conspirators and a law enforcement informant testified regarding the gun. C.K. testified she had conversations with Wilson and Moore where she observed the gun and heard Wilson and Moore refer to the gun as a ".40."[116] C.K. identified Moore as the person holding the gun during the robberies.[117] C.K. also observed the gun before the Phoenixville robbery and identified it as the same gun used during the Bala Cynwyd robbery and as the gun she observed before the robberies.[118] M.F., as discussed above, met with Wilson and Moore to discuss the use of a gun and observed the gun during the meeting.[119] M.F. identified the gun as a "Glock."[120] At the time Wilson and Moore showed M.F. the gun, Wilson described the gun as "fully loaded."[121] M.F. testified Moore entered the Bala Cynwyd and Phoenixville banks with the same gun shown to him.[122] Law enforcement informant L.H. testified he met with Wilson and Moore before the first robbery where Wilson told L.H. he obtained a new gun, a ".40."[123] After Detective Kerr reviewed the surveillance footage and still images of the robberies, Detective Kerr testified the gun used during the robberies appeared to be the same gun he carried, a .40 caliber Glock.[124]

20

Law enforcement never recovered the gun used in the robberies.[125] None of the witnesses held the gun at issue. Wilson's and Moore's trial counsel highlighted these facts on cross-examination. Defense counsel also highlighted inconsistencies in the cooperating co-conspirators' statements to law enforcement, these inconsistencies in relation to reaching plea agreements with United States, and omissions of information from law enforcement interview notes. Finally, defense counsel highlighted Wilson created rap music videos and M.F. told law enforcement he appeared in one of the videos using a prop gun.[126] Law enforcement recovered a prop gun from Wilson's aunt's home, but it did not look similar to the gun used during the robberies.[127]

The testimony presented is sufficient to sustain the firearm conviction. The Wells Fargo employees' testimony alone is sufficient to sustain the firearm conviction.[128] The employees provided descriptions of the gun and several employees identified the gun as "semi-automatic." One employee had experience handling firearms dating back to his childhood and believed the firearm to be real. The verbal threat posed to the Bala Cynwyd teller asking if she wanted to die for the bank's money, although not stated by the gun wielder, is further evidence of the gun's authenticity.

The conviction is further supported by the co-conspirator testimony. The co-conspirators described the gun as a ".40" and a "Glock." Upon showing M.F. the gun before the first robbery, Wilson described the gun as "fully loaded." Both co-conspirators testified Moore used the same gun during both robberies. Finally, L.H. testified Wilson told him he acquired a ".40" to use during the robberies. The fact no witness handled the gun at issue and United States failed to produce the gun is of no consequence. The inconsistencies in prior statements offered to law enforcement by the co-conspirators and the fact the co-conspirators entered into plea agreements

21

with the United States goes to witness credibility, and the weight of evidence is within the jury's province.

Based on the testimony presented, a rational juror could conclude beyond a reasonable doubt the conspirators used a firearm during the commission of the armed bank robberies.

## B. We deny Messrs. Wilson's and Moore's motions for a new trial.

Under Rule 33, we "may vacate any judgment and grant a new trial if the interest of justice so requires."[129] Whether to grant such a motion is within our discretion, and we may do so "only if [we] believe[] that there is a serious danger that a miscarriage of justice has occurred – that is, that an innocent person has been convicted."[130] Rule 33 motions for a new trial "are not favored and should be 'granted sparingly and only in exceptional cases.'"[131]

### 1. Messrs. Wilson's and Moore's ineffective assistance of counsel claims are premature.

Messrs. Wilson and Moore argue their trial counsel did not explain the stipulation to the FDIC insured status, did not seek their consent to enter into the stipulation, and did not explain the implications of entering into the stipulation.

Our court of appeals has made clear courts generally should "not entertain Sixth Amendment ineffective assistance of counsel claims under *Strickland v. Washington* . . . on a direct appeal."[132] The reluctance to entertain ineffective assistance claims on direct review arises from the fact "such claims frequently involve questions regarding conduct that occurred outside the purview of the district court and therefore can be resolved only after a factual development at an appropriate hearing."[133] District courts have routinely applied this reasoning to refuse assessing ineffective claims on a Rule 33 motion.[134]

Consideration of Wilson's and Moore's ineffective assistance of counsel claims is inappropriate at this time. The claim is based upon on their trial counsel's advice and

22

information known to their trial counsel before and at the time of trial. This evidence is not reflected in the trial record. Assessing trial counsels' conduct requires analysis of facts not before us. We decline to entertain Wilson and Moore's ineffective assistance claims at this time.

## 2. Mr. Wilson's opening statement did not prejudice Mr. Moore.

During opening statements Mr. Wilson's counsel explained Wilson would not deny he participated in the robberies, but instead only challenged whether the conspirators used an actual firearm in the commission of the robberies. Mr. Moore argues he is entitled to a new trial because Wilson's opening statement prejudiced him by enhancing the credibility of cooperating co-conspirator witnesses. According to Moore, Wilson's opening statement allowed the jury impermissibly infer the co-conspirator witnesses would be truthful regarding their testimony against him because they testified truthfully against Wilson. "In determining prejudice, we consider the scope of the objectionable comments and their relationship to the entire proceeding, the ameliorative effect of any curative instructions given, and the strength of the evidence supporting the defendant's conviction."[135]

During her opening statement, Wilson's counsel stated, "Now, in this case, Mr. Wilson and I are not going to try and deny that he was involved in this crime. I predict that [the United States] will, indeed, provide sufficient evidence to show that Mr. Wilson, at least, took part in these crimes. But you're not going to hear reliable corroborated evidence that a real firearm was used, and you will hear no evidence that Mr. Wilson brandished a firearm."[136] Wilson's counsel further stated, "Mr. Wilson is not going to stand up before you and deny involvement; however, unlike other people, he is also not going to plead guilty to something he didn't do and implicate others just for the sake of helping himself."[137]

23

Moore specifically challenges the first three sentences quoted above. We fail to see how Wilson's counsel's statement could be construed to allow for an impermissible inference the jury should trust the co-conspirators' testimony as truthful against Moore. Wilson's counsel's statements frame what she believed to be the key issue for the jury with respect to Wilson – whether Wilson used a real firearm during the commission of the robberies. Critically, Wilson's counsel spoke in the singular. She stated "*Mr. Wilson* and I are not going to try and deny that *he* was involved in this crime."[138] She did not mention or refer to Moore, his case, or his defense theory. Wilson's counsel's precision in her statement weighs in favor of finding the statement did not prejudice Mr. Moore.

Wilson's counsel did not suggest to the jury they should trust the co-conspirator testimony as truthful or enhance their credibility. In fact, the opening attempted the opposite. Wilson's counsel questioned the motives of the cooperating co-conspirator witnesses by suggesting the co-conspirators took a guilty plea for a crime they did not commit and implicated Wilson for their own self-interest. Wilson's counsel also suggested to the jury it would not hear *reliable* evidence regarding the firearm issue. Witness credibility is within the province of each juror and viewing Wilson's counsel's opening statement as a whole, the statement did not impermissibly enhance or allow for an inference of truthfulness of the co-conspirator testimony.

Even if we did find Wilson's counsel's opening prejudicial to a slight degree, Judge Davis's opening and closing instructions and the sufficiency of evidence against Moore adequately dispel any prejudice. During his preliminary instructions and immediately before opening statements, Judge Davis explained, "When I finish speaking to you, the attorneys are going to make their opening addresses to you. Anything a lawyer says is not evidence. Evidence is what comes from the witness stand, the stipulations, the photographs, the videos, and

24

the like. That's evidence. Right? But the lawyers are going to speak to you almost like an outline to a book to tell you their sense of what will happen next in this case, what's this case about . . . So then when the government – when the openings are finished, you'll begin to hear evidence."[139] In his closing instructions, Judge Davis again explained, "And in looking at the evidence in the case, please remember that you're looking at the testimony that has been provided and the exhibits and the stipulations and videos. So the arguments of lawyers are not evidence. The questions of lawyers aren't evidence. The evidence are the stipulations, the testimony and the exhibits."[140]

Judge Davis explained the opening statement should only be viewed as an outline of Wilson's case. Wilson's counsel used her opening statement to identify the key issue Wilson challenged at trial. After opening statements, the jurors heard extensive trial testimony over the course of the five day trial. As discussed above, the jury heard sufficient evidence to find Moore guilty on all counts. The purported prejudice is entirely speculative. Wilson's counsel's statement cannot be construed to prejudice Moore by allowing jurors to infer all statements made by co-conspirators were truthful. Moore is not entitled to a new trial.

### 3. The United States did not improperly vouch for its witnesses and credibility.

Messrs. Wilson and Moore argue the United States improperly vouched for its witnesses and its own credibility during closing arguments. United States argued it did not improperly vouch for witnesses or itself and to the extent any prejudice is found, the sufficiency of evidence presented and Judge Davis's jury instructions cured any prejudice.

"A prosecutor improperly vouches when he (1) assures the jury that the testimony of a government witness is credible, and (2) bases his assurance on either his claimed personal knowledge or other information not contained in the record."[141] "Where, however, a prosecutor

25

merely 'argues that a witness is being truthful based on the testimony given at trial, . . . the prosecutor is engaging in proper argument and is not vouching.'"[142] "A prosecutor may argue in the negative that the assertions made by defense counsel that a witness is lying are not supported by the testimony in the record."[143] "When reviewing statements for improper vouching, we must consider them 'in the context in which they were given.'"[144] An isolated statement, grounded in record evidence, made in response to defense counsel's attack of an investigation into the defendant's conduct is not improper vouching.[145]

Messrs. Wilson and Moore challenge part of United States' rebuttal in closing argument: "Somehow there is this suggestion that – and I was surprised to hear this – we're somehow complicit in this plan to turn the tables on these two guys and have you find them guilty when they're – at least Moore, when he's really not. Do you think – you heard Kerr. You heard Ben Martin. You heard Sucheski. You heard Fitzgerald. And I've been standing up in front of you the entire week talking and questioning witnesses. Do you think we all put blinders on and, when we saw the information provided by [C.K.] and [M.F.] when they first talked to police and it wasn't – there was no gun mentioned, that we wanted there to be a gun so bad that we got them to change their story and didn't let them plead guilty until they told us it was a gun? Do you believe that for a minute, ladies and gentleman? You have no reason to believe that."[146]

The United States' argument is a reasoned response to attacks of credibility of the investigation into Wilson and Moore. The United States directly framed its argument as a response to the attack of the integrity of the investigation. United States' counsel does not offer his personal opinion. The United States grounded its argument in the adduced evidence. The United States specifically reminded the jury of the persons who participated in the investigation and testified over the trial week. The United States submitted to the jury they have no basis in

the evidence presented to conclude the prosecution conducted an improper investigation stating, "You have no reason to believe that."

Immediately before this argument, the United States offered an alternative explanation for the cooperating witnesses' change in statements. The United States explained the cooperating witnesses offered different facts during subsequent interviews to satisfy their obligations under the plea agreement, which required the witnesses to provide the prosecution complete and truthful information.[147] Immediately after the United States' argument, counsel provided an example and summarized for the jury the ways in which the evidence corroborated one of the cooperating witness's testimony.[148] Reading the United States' statement in context of the defenses' closing arguments, the United States did not improperly vouch for its witnesses, but submitted to the jury an appropriate response to the attacks of credibility of the United States' witnesses and investigation.

### 4. Judge Davis defined "brandish" for the jury.

The jury unanimously found United States proved beyond a reasonable doubt Wilson and Moore brandished a firearm during the armed robberies. Messrs. Wilson and Moore argue Judge Davis never instructed the jury on the definition of "brandish." Messrs. Wilson and Moore argue the jury could not have properly found they brandished a firearm without knowing the definition of "brandish."

Judge Davis read instructions before the jury received the verdict slip. These initial instructions did not contain a definition of the term "brandish." At the close of instructions, Judge Davis explained the jury would receive the verdict slip in a few minutes.[149] After Judge Davis sent the jury back for deliberations, Judge Davis met with trial counsel to discuss the verdict slip. Judge Davis held the discussion off the record. After this discussion, Judge Davis

27

called the jury back and explained he and trial counsel agreed to a last-minute change to the verdict slip. Judge Davis decided to include a jury interrogatory regarding the Section 924(c) offense asking if the jury unanimously finds United States proved beyond a reasonable doubt Wilson and Moore, or a conspirator or accomplice, brandished the firearm while committing the armed bank robberies.[150] Judge Davis immediately defined the term "brandish" for the jury.[151] After this instruction, the jury returned to their deliberations. Wilson and Moore are wrong on the facts and not entitled to a new trial based on this argument.

## III. Conclusion

The jurors heard detailed evidence from victims of the bank robberies, two of the four robbers, and multiple law enforcement officers tasked with investigating the robberies. The detailed testimony provided ample grounds for the jury to unanimously find Messrs. Wilson and Moore guilty on all counts. The grounds for a new trial fail because some claims are procedurally premature and the remaining claims do not demonstrate a serious danger of a miscarriage of justice convincing us an innocent person has been convicted. We deny Messrs. Wilson's and Moore's motions in the accompanying Order.

---

[1] Fed. R. Crim. P. 29(a), (c)(1).

[2] *U.S. v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002) (quoting *U.S. v. Wolfe*, 245 F.3d 257, 262 (3d Cir. 2001)); *see also U.S. v. Salahuddin*, 765 F.3d 329, 348 (3d Cir. 2014).

[3] *Smith* at 476-477 (quoting *U.S. v. Anderskow*, 88 F.3d 245, 251 (3d Cir. 1996) and *U.S. v. Leon*, 739 F.2d 885, 891 (3d Cir. 1984)).

[4] *U.S. v. McKee*, 506 F.3d 225, 232 (3d Cir. 2007) (quoting *U.S. v. Coyle*, 63 F.3d 1239, 1243 (3d Cir.1995)).

[5] *United States v. Veras de los Santos*, 184 F. App'x 245, 251 (3d Cir. 2006) (citing *United States v. Conley*, 37 F.3d 970, 976-77 (3d Cir. 1994)).

[6] N.T. September 28, 2016 at pp. 23-24.

[7] *Id.* at p. 31.

[8] *Id.*

[9] *Id.*

[10] *Id.* at pp. 32-33.

[11] *Id.* at p. 34-35.

[12] *Id.* at pp. 35-38.

[13] *Id.* at p. 36.

[14] *Id.* at p. 36-37.

[15] *Id.* at p. 32.

[16] *Id.* at p. 39.

[17] *Id.*

[18] N.T. September 29, 2016 at pp. 26-27.

[19] *Id.* at p. 29.

[20] *Id.* at p. 31.

[21] *Id.* at pp. 31-32.

[22] *Id.* at p. 32.

[23] *Id.* at p. 34.

[24] *Id.* at pp. 34-37.

[25] *Id.* at p. 34.

[26] *Id.* at p. 37.

[27] *Id.* at pp. 39-40.

[28] *Id.* at p. 27.

[29] *See United States v. De Larosa*, 450 F.2d 1057, 1060-61 (3d Cir. 1971); *United States v. Norman*, 465 F. App'x 110, 118-19 (3d Cir. 2012); *United States v. Gagliardi*, No. 04-796, 2005 WL 1592947, at \*8 (E.D. Pa. Jul. 5, 2005).

[30] N.T. September 28, 2016 at pp. 279-281.

[31] *Id.* at 279-81, 325.

[32] *Id.*

[33] 18 U.S.C. § 2113(a).

[34] *Id.* § 2113(d).

[35] *See United States v. Beckett*, 208 F.3d 140, 151-52 (3d Cir. 2000) (fake bombs satisfied meaning of "dangerous weapon" as the bombs "would reasonably have instilled fear in an average person").

[36] *United States v. Harmon*, 681 F. App'x 152, 156 (3d Cir. 2017); *United States v. Dupree*, No. 08-170, 2010 WL 1994281, at \*2-3 (M.D. Pa. May 18, 2010).

[37] *Id.*

[38] N.T. September 26, 2016 at pp. 56-58.

[39] *Id.* at p. 57.

[40] *Id.* at pp. 59.

[41] *Id.* at p. 62.

[42] *Id.* at p. 60.

[43] *Id.* at p. 62.

[44] *Id.*

[45] N.T. September 27, 2016 at p. 12.

[46] *Id.* at pp. 13-14.

[47] *Id.* at p. 43.

[48] *Id.* at p. 44.

[49] *Id.* at p. 50.

[50] *Id.* at p. 63.

[51] *Id.* at pp. 70-73.

[52] *Id.* at pp. 73-74.

[53] *Id.* at p. 73.

[54] *Id.*

[55] *Id.* at p. 75.

[56] *Id.* at pp. 103.

[57] *Id.* at pp. 124-25.

[58] N.T. September 28, 2016 at pp. 44-45.

[59] *Id.* at pp. 82-83.

[60] *Id.* at pp. 84-85.

[61] *Id.* at pp. 92-96.

[62] *Id.* at 91.

[63] *Id.*

[64] N.T. September 29, 2016 at p. 16.

[65] *Id.* at pp. 44-47.

[66] *Id.* at pp. 44-45.

[67] *Id.* at pp. 63-64.

[68] *Id.*

[69] N.T. September 27, 2016 at p. 165.

[70] *Id.* at pp. 252-59.

[71] *Id.*; N.T. September 28, 2016 at p. 242.

31

[72] N.T. September 28, 2016 at p. 240.

[73] N.T. September 27, 2016 at pp. 252-59.

[74] N.T. September 28, 2016 at p. 237.

[75] N.T. September 27, 2016 at pp. 260-62.

[76] N.T. September 28, 2016 at pp. 52-53.

[77] N.T. September 27, 2016 at p. 173.

[78] N.T. September 28, 2016 at pp. 122-28.

[79] N.T. September 29, 2016 at p. 166.

[80] *Id.* at pp. 180-81.

[81] *See Beckett*, 208 F.3d at 151-52.

[82] N.T. September 28, 2016 at p. 162.

[83] 18 U.S.C. § 2113(f).

[84] *See United States v. Spinello*, 265 F.3d 150, 155 (3d Cir. 2001).

[85] *See e.g.*, *United States v. King*, No. 09-211, 2010 WL 1539886, at *18 (E.D. Pa. Apr. 14, 2010); *United States v. Jamal*, No. 97-4558, 1998 WL 164866, at *1 (N.D. Ill. Apr. 3, 1998) (citing *United States v. Knop*, 701 F.2d 670, 674 (7th Cir. 1983)).

[86] No. 09-211, 2010 WL 1539886 (E.D. Pa. Apr. 14, 2010).

[87] *Id.* at *1.

[88] *Id.* at *15-16.

[89] *Id.*

[90] *Id.* at *17.

[91] *Id.* at *20.

[92] *Id.* at *18.

[93] N.T. September 27, 2016 at p. 62-65.

[94] *Id.* at p. 62.

[95] *See United States v. Costello*, No. 14-107, 2016 WL 521245, at \*3 (E.D. Pa. Feb. 10, 2016) (testimony from bank's fraud and security investigator identifying bank's FDIC insured status at time of robbery coupled with introduction of FDIC certificate is sufficient evidence of FDIC insured status).

[96] Counsel for both Moore and Wilson conceded at oral argument consideration of issues regarding the appropriateness of trial counsels' decision to enter into the stipulation is not procedurally appropriate under a Rule 29 or Rule 33 motion.

[97] Based on the same arguments presented under Rule 29, Wilson and Moore move for a new trial under Rule 33 because the conviction under 924(c) is contrary to the weight of evidence. "[Our court of appeals] has emphasized that motions for a new trial based upon weight of the evidence are not favored and should be granted sparingly, and only in exceptional cases." *United States v. King*, No. 09-211, 2010 WL 1539886, at \*24 (E.D. Pa. Apr. 14, 2010). Having assessed the evidence presented, Wilson and Moore's motion under Rule 33 fails. The weight of the evidence supported the jury's verdict. We do not find a miscarriage of justice and the weight of the evidence "does not leave the court with the impression that an innocent man was convicted." *See id.*

[98] 18 U.S.C. § 924(c)(1)(A).

[99] *Id.* § 2.

[100] 18 U.S.C. § 921(a)(3).

[101] *United States v. Green*, 664 F. App'x 193, 199 (3d Cir. 2016) (citing *United States v. Beverly*, 99 F.3d 570, 572 (3d Cir. 1996)).

[102] *United States v. Lamour*, 209 F. App'x 125, 126 n.2 (3d Cir. 2006).

[103] *See United States v. Costello*, No. 14-107, 2016 WL 521245, at \*3 (E.D. Pa. Feb. 10, 2016) (testimony from two bank tellers describing firearm as "black and silver" and "semi-automatic" is sufficient to sustain conviction); *United States v. Graves*, No. 06-95-01, 2007 WL 2461744, at \*4-5 (E.D. Pa. Aug. 22, 2007) (testimony from bank teller and bank assistant manager describing gun and belief of gun's authenticity is sufficient to sustain conviction); *United States v. Lamour*, 209 F. App'x 125, 126 n.2 (3d Cir. 2006) (testimony from two bank tellers describing gun and belief gun looked real is sufficient to sustain conviction).

[104] *See United States v. Beverly*, 99 F.3d 570, 572-73 (3d Cir. 1996).

[105] *Beverly*, 99 F.3d at 573 (quoting *United States v. Marshall*, 427 F.3d 434, 437 (2d Cir. 1970)).

[106] N.T. September 26, 2016 at p. 58.

[107] *Id.* at p. 62.

[108] N.T. September 27, 2016 at p. 12.

[109] *Id.* at pp. 45-46.

[110] *Id.* at pp. 46-47.

[111] *Id.* at p. 48.

[112] *Id.* at pp. 56-57.

[113] *Id.* at pp. 71-73.

[114] *Id.* at p. 71.

[115] *Id.* at p. 104.

[116] N.T. September 28, 2016 at pp. 31-32.

[117] *Id.* at pp. 44-45, 83.

[118] *Id.* at pp. 82-83.

[119] N.T. September 29, 2016 at pp. 31-33.

[120] *Id.* at p. 33.

[121] *Id.* at p. 32.

[122] *Id.* at pp. 43, 65.

[123] N.T. September 28, 2016 at p. 277.

[124] N.T. September 27, 2016 at p. 173.

[125] *Id.* at p. 276; N.T. September 28, 2016 at pp. 255-56.

[126] N.T. September 27, 2016 at p. 330.

[127] N.T. September 29, 2016 at p. 147.

[128] *See United States v. Costello*, No. 14-107, 2016 WL 521245, at \*3 (E.D. Pa. Feb. 10, 2016); *United States v. Graves*, No. 06-95-01, 2007 WL 2461744, at \*4-5 (E.D. Pa. Aug. 22, 2007); *United States v. Lamour*, 209 F. App'x 125, 126 n.2 (3d Cir. 2006).

[129] Fed. R. Crim. P. 33(a).

[130] *U.S. v. Cimera*, 459 F.3d 452, 458 (3d Cir. 2006) (citing *Gov't of Virgin Islands v. Lima*, 775 F.2d 1245, 1250 (3d Cir. 1985)) and *U.S. v. Staten*, 557 F. App'x 119, 121-122 (quoting *U.S. v. Silveus*, 542 F.3d 993, 1005-05 (3d Cir. 2008)).

[131] *U.S. v. Silveus*, 542 F.3d 993, 1117 (3d Cir. 2008) (quoting *Gov't of Virgin Islands v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987)).

[132] *United States v. St. Vallier*, 404 F. App'x 651, 663-64 (3d Cir. 2010) (collecting cases).

[133] *Id.* (quoting *Gov't of Virgin Islands v. Zepp*, 748 F.2d 125, 133 (3d Cir. 1984).

[134] *See e.g.*, *United States v. Zomber*, 358 F. Supp. 2d 442, 453-54 (E.D. Pa. Feb. 28, 2005) ("This rationale applies here, as this Court may require an evidentiary hearing to further develop the record before ruling on some of [the defendant's] ineffective assistance claims. Therefore, [the defendant's] ineffective assistance of counsel claim are more appropriate for a § 2255 petition."); *United States v. Watson*, No. 02-426, 2003 WL 22797242, at \*4-5 (E.D. Pa. Nov. 14, 2003) ("Entertaining [the defendant's] ineffective assistance of counsel claims on a Rule 33 Motion would be particularly inappropriate given that the allegations would require an evidentiary hearing, which could further delay [the defendant's] sentencing. Furthermore, [the defendant] has a clear remedy for his counsel's alleged inadequate assistance in the form of a petition filed pursuant to 28 U.S.C. § 2255. Thus, this Court in its discretion declines to entertain [the defendant's] ineffective assistance of counsel claims at this time.").

[135] *United States v. Helbling*, 209 F.3d 226, 241 (3d Cir. 2000) (citing *United States v. Zehrbach*, 47 F.3d 1252, 1265 (3d Cir. 1995)).

[136] N.T. September 26, 2016 at p. 33.

[137] *Id.* at p. 35.

[138] *Id.* at p. 33 (emphasis added).

[139] *Id.* at p. 5.

[140] N.T. September 30, 2016 at p. 7.

[141] *United States v. Dollison*, 609 F. App'x 108, 111 (3d Cir. 2015) (quoting *United States v. Lore*, 430 F.3d 190, 211 (3d Cir. 2005)).

[142] *Id.* (citing *United States v. Walker*, 155 F.3d 180, 187 (3d Cir. 1998)).

[143] *Id.* (citing *Walker*, 155 F.3d at 187).

[144] *Id.* (citing *Lore*, 430 F.3d at 212).

[145] *See United States v. Rodriguez*, 597 F. App'x 713, 715-16 (3d Cir. 2015).

[146] N.T. September 29, 2016 at p. 301-02.

[147] *Id.* at p. 300-01.

[148] *Id.* at p. 302.

[149] N.T. September 30, 2016 at p. 51-52.

[150] *Id.* at pp. 52-55.

[151] *Id.* at p. 53.